IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHARON S. SLATON,

    Plaintiff,

    v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

CIVIL ACTION FILE

NO. 1:06-CV-1419-GGB

## **FINAL ORDER**

Plaintiff Sharon S. Slaton brings this civil action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits. Plaintiff applied for benefits on October 22, 2001, alleging a disability onset date of June 14, 2000. The Social Security Administration denied her application initially and on reconsideration. Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and one was held on June 30, 2004. On November 3, 2005, the ALJ issued a decision denying Plaintiff's claim. Thereafter, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Plaintiff has exhausted her

administrative remedies, and this case is ripe for judicial review.

For reasons stated below, the Commissioner's final decision denying Plaintiff's application for a period of disability and disability insurance benefits is **REVERSED** and this case is **REMANDED** to the Commissioner for payment of benefits.

I.    FACTS

A.    Medical Evidence

Plaintiff's medical records establish that she suffers from gastroparesis and diabetes.  Gastroparesis is a disorder, often associated with diabetes, in which the stomach takes too long to empty its contents.  (R. 343[1]).  The disorder occurs when stomach nerves become damaged or stop working.  (R. 343).  Symptoms of gastroparesis, which can range from mild to severe, include heartburn, nausea, vomiting of undigested food, an early feeling of fullness when eating, weight loss, abdominal bloating, erratic blood glucose levels, lack of appetite, gastroesophageal reflux, and spasms of the stomach wall.  (R. 344).  A person with the disorder may be

_____

[1]Medical information regarding gastroparesis, which appears in the record, is derived from the National Digestive Diseases Information Clearinghouse, a service of the National Institute of Diabetes and Kidney Diseases, and is available at http://digestive.niddk.nih.gov/ddiseases/pubs/gastroparesis/.  (See R. 343-51).

2

able to digest normally on some days, but not on others.  (See R. 345-46).  In most cases, the disorder becomes a chronic condition that cannot be cured.  (R. 347).  "For the most severe forms of gastroparesis, bouts of nausea and vomiting may cycle in a pattern of flare-ups or may be a daily occurrence persisting for years.  These unrelenting symptoms may cause emergency-room visits for rehydration and may lead to chronic malnutrition.  There are approximately 1.6 million diabetics suffering with the more severe forms of gastroparesis." Gastroparesis and Dysmotilities Association, *Digestive Motility Diseases/Disorders: Diabetic Gastroparesis*, http://digestivedistress.com/dia_gastro_sub_a.html (July 12, 2007).

Plaintiff developed severe gastroparesis in 1999 and was hospitalized on several occasions during that year.  Her symptoms included "intractable nausea and vomiting," as well as hypertension and dehydration.  (E.g., R. 128, 174, 244).  During her hospitalizations, Plaintiff was frequently seen by Gregory H. Gibson, M.D., who is a gastroenterologist.  (See, e.g., R. 244-247, 260).  Dr. Gibson also treated Plaintiff as an outpatient on several occasions during the first half of 1999, and continued to provide her with prescription medication through at least May 2000.  (See R. 221, 223, 228-35).

On June 1, 1999, Dr. Gibson referred Plaintiff to J. Patrick Waring, M.D., a

AO 72A
(Rev.8/82)

gastroenterologist practicing at the Swallowing Center at Emory University, for a second opinion. (R. 223). Dr. Waring noted that Plaintiff had previously undergone a gastric emptying study ("GES"), which revealed slow gastric emptying. (R. 327). He concluded that Plaintiff was suffering from delayed gastric emptying and gastroesophageal reflux, for which he adjusted her medications. (R. 328). At the time, Plaintiff weighed only 99 pounds. (R. 328).

Dr. Waring continued to treat Plaintiff through at least January 2000. (See R. 300-26). In a letter to Dr. Gibson following Plaintiff's October 25, 1999 visit, Dr. Waring noted that Plaintiff was suffering from "severe gastroparesis," which had not responded well to "any therapy." (R. 305). He stated that Plaintiff had been hospitalized five times in 1999 and had lost approximately 40 pounds. (Id.). Dr. Waring noted that Plaintiff generally did well for the first few days following her hospitalizations, but then returned to her previous condition. (Id.).

On January 3, 2000, Dr. Waring reported that Plaintiff's condition had improved significantly over the previous six to eight weeks and that she had gained weight. (R. 297). Plaintiff's weight had increased from 99 pounds in October 1999 to 119 in January 2000. (See R. 303, 307). Dr. Waring concluded that Plaintiff was "doing splendidly," but expressed uncertainty as to why her condition had improved. (R.

4

297).

On February 3, 2000, Plaintiff's primary care physician, C. Bato Amu, M.D., noted that Plaintiff's weight had dropped to 103 pounds, and she still had gastroparesis.  (R. 113).  Plaintiff had been seeing Dr. Amu since at least December 1998, when he diagnosed her as suffering from diabetes.  (See R. 118-22, 174).

On May 27, 2000, Plaintiff returned to the hospital emergency room, suffering from "nausea, vomiting, edema and hypertension" plus "generalized weakness."  (R. 144).  By June 9, 2000, Plaintiff weighed only 90 pounds, and Dr. Amu described her gastroparesis as "severe."  (R. 107).

On June 20, 2000, Plaintiff began treatment with Raymond A. Rubin, M.D., a specialist at Piedmont Hospital.  Dr. Rubin noted that Plaintiff's symptoms had worsened and that she was nauseated "all the time."  She weighed only 92 pounds.  (R. 188).  Dr. Rubin believed that Plaintiff was likely suffering from diabetic gastroparesis (as opposed to post-viral gastroparesis) as the result of "previously unrecognized long-standing diabetes . . . ."  (R. 189).  A gastric-emptying test performed at Dr. Rubin's request on September 18, 2000 revealed significant delay in Plaintiff's stomach emptying.  (R. 187).  On October 12, 2000, Dr. Rubin saw Plaintiff again and performed an endoscopy, which ruled out any significant physical abnormalities in

AO 72A
(Rev.8/82)

Plaintiff's digestive tract (a possible alternative cause for her gastroparesis).  (R. 182).  Plaintiff continued under Dr. Rubin's care at least through October 12, 2000.  (See R. 182).

The administrative record does not contain any treatment notes for the period of time after October 12, 2000 until September 19, 2001, when Plaintiff returned to Dr. Amu.  Dr. Amu noted that Plaintiff continued to suffer from "severe gastroparesis" despite her continuing course of treatment on Reglan.  She weighed only 104 pounds.  The following month, her weighted had increased to 124 pounds.  (R. 107, 101).

Dr. Amu saw Plaintiff again in January 2002.  His progress notes for April of that year state that Plaintiff was "coming off [a] gastroparesis spell."  He also observed that Plaintiff's gastroparesis flare-ups generally resolve spontaneously after about one week.  Plaintiff weighed 120 pounds.  (R. 99, 101).  Dr. Amu continued to treat Plaintiff with prescription medications for both diabetes and gastroparesis until the administrative hearing on June 30, 2004.  (R. 98-122, 202-04, 338-39).

On March 20, 2002, a non-examining consultative physician concluded that, although Plaintiff suffered from gastroparesis, she retained the ability to perform work related activities.  (R. 190-98).

On January 21, 2003, Plaintiff returned to Dr. Gibson, at which time she

6

weighed 120 pounds.  Dr. Gibson noted that Plaintiff reported experiencing daily nausea and vomiting on a two-week cycle.  He changed Plaintiff's medication from Reglan to domperidone because of possible side effects from long-term use of Reglan. (R.216).

That same day, Dr. Gibson completed a "Medical Assessment of Ability To Do Work-Related Activities" on Plaintiff's behalf.  He concluded that Plaintiff has numerous exertional limitations.  In support of his assessment, he stated that Plaintiff "has gastroparesis and nausea and vomiting during 2 week periods at a time," and that, when nausea and vomiting occur, she "cannot do anything." (R. 217-18).  Dr. Gibson believed that Plaintiff's condition had not changed since June of 2000. (R. 218).  In an addendum, Dr. Gibson found that Plaintiff would need to alternate at will between sitting and standing, and would need to lie down at will during the day.  He indicated that her fatigue would interfere with daily activities, such as ordinary attentiveness and efficiency at performing household chores, as well as basic work activities.  He believed that she would need more than five unscheduled breaks from work during the day and that she could be expected to have more than four absences from work during each calendar month. (R. 219).

Plaintiff continued under Dr. Gibson's care through June 2003.  On March 3, Dr.

Gibson noted (as Plaintiff testified) that she "had only one episode of nausea and vomiting during February." (R. 368). She weighed 136 pounds. (R. 214-215). On June 4, 2003, Dr. Gibson reported that Plaintiff had suffered a relapse, and he noted the cyclical pattern of her symptoms: "She has had a good month, bad month, good month, bad month." She weighed 132 pounds. (R. 212).

On September 22, 2003, Dr. Amu also noted the cyclical nature of Plaintiff's condition, stating that she had flare-ups for two weeks of each month. She still weighed 132 pounds. (R. 202). On December 8, 2003, Dr. Amu completed a "Medical Assessment of Ability To Do Work-Related Activities." His findings were not as restrictive as Dr. Gibson's, but he nonetheless found limitations inconsistent with gainful employment, as the vocational expert later confirmed.[2] Dr. Amu's conclusion was "chronic debilitation from chronic vomiting and weight loss." (R. 206).

In an addendum to Dr. Amu's assessment, he too found that Plaintiff would need to lie down at will at times during the day. He agreed that fatigue interfered with nearly all relevant daily activities. He also believed that she would need more than

_____

[2]When asked whether the limitations noted by Dr. Amu would prevent Plaintiff from working, the vocational expert stated that they would. (R. 382).

five unscheduled breaks from work during the day when she was experiencing a flare-up, and that she could be expected to have more than four absences from work per month.  (R. 208).  Like Dr. Gibson, he concluded that Plaintiff's condition had remained substantially unchanged since June of 2000.  (R. 209).

Plaintiff saw Dr. Gibson again on April 26, 2004 and reported that she tends to have two bad weeks followed by two good weeks.  (R. 334).  Plaintiff weighed 140 pounds.  (Id.).

On September 29, 2004, Dr. Waring completed a "Pain Questionnaire" on Plaintiff's behalf.  He described Plaintiff's gastroparesis as "severe" and stated that she was "unable to eat for 2 weeks out of each month."  She "experience[s] nausea, vomiting and discomfort even when . . . in a low stress environment."  He expressly found her "credible regarding the severity, duration, frequency, and other factors regarding [her] alleged discomfort."  (R. 332).  Dr. Waring concluded that it is "medically reasonable for [Plaintiff] to need to lie down for a minimum of two (2) hours during the daytime when symptomatic."  He added that it is "medically reasonable for" her "to be unable to report for work . . . due to nausea, vomiting, and discomfort" for "2 weeks per month."  His ultimate conclusion was that Plaintiff had not "been physically capable of reliably performing a full eight-hour workday

AO 72A
(Rev.8/82)

(including sedentary occupations) five days a week since [her disability] onset date . . . ."  (R. 333).

    B.    <u>Other Evidence</u>

Plaintiff testified at the administrative hearing that her symptoms had been worst in 1999, when she "was sick sometimes it seemed like months at a time."  (R. 370).  In June 2000, she quit her job because she "was getting sick so regularly that [she] was about to get fired . . . ."  (R. 364).  Plaintiff "had used up all of [her] vacation days and free days because [she] was out sick."  (R. 366).  By the time of the administrative hearing (June 2004), Plaintiff's gastroparesis had fallen into a pattern of flare-ups approximately two weeks out of each month.  (R. 366).  Plaintiff testified that, during flare-ups, she would be "nauseous and throwing up and unable to eat."  (R. 368).  She stated that she cannot sit for long when she is in this condition and that she cannot lay down at all: "I've become adapted to sleeping standing up in the bathroom."  (R. 373).  After one acute week, Plaintiff spends another week just coming out of the shock.  She is "still weak and still in the process of building [her]self back up."  (R. 376).  "For about the [next] five to six days," she is "all bent over and . . . extremely, extremely weak and can only [ingest] liquids or soup for a few days."  (R. 374).

Plaintiff testified that she has the strength to clean house only once a month and that she feels up to attending a movie only once a month.  (R. 374-75, 377).  She stated that she would have been able to work about one week per month, but that other weeks she could not do anything, even eat.  (R. 369).  Furthermore, she could not accurately predict when her good weeks would occur.  (R. 369-70).

From January 2002 to early April 2004, Plaintiff charted her flare-ups on calendars, which she presented at the administrative hearing.  (R. 262-73, 276-92, 367-68).  Those calendars indicate that, during this time period, she was sick, on average, approximately 11.5 days per month.  For two of those months (February 2002 and March 2003), she was not sick on any days; for one month (November 2002), she was sick every day.  (See R. 262-73, 276-92).

According to Plaintiff, Dr. Amu informed her that her gastroparesis was the worst case he had ever seen.  (R. 378).  With regard to lulls in her treatment, Plaintiff testified that she had received active medical treatment with specialists until about the time she left her job.  Thereafter, Dr. Amu provided most of her care.  (R. 366-67).  She stopped seeing Dr. Gibson and Dr. Waring (the specialists) because Dr. Gibson had advised her that no additional treatments were available and that he could only provide medication to treat her symptoms.  (R. 371-73, 378).  "He basically could only

11

offer the same medicine, there was no new treatment.  There was nothing else that Dr. Gibson could do for me other than keep me on the Reglan." (R. 371).  "So from that point on, it was just a matter of getting my medicine and taking them." (R. 366). Plaintiff also lost her health insurance in February 2002, when she and her husband were divorced.  (R. 372-73).

Plaintiff testified that when she was not seeing specialists, Dr. Amu provide her Reglan prescriptions.  (R. 366).  Plaintiff's pharmacy records indicate that she filled six Reglan prescriptions from Dr. Amu between September 2001 and December 2002. (R. 337-39).

According to Plaintiff, she returned to Dr. Gibson in 2003 to inquire about possible new treatments.  At that time, Dr. Gibson switched her medication from Reglan to domperidone due to possible side effects from long term use of Reglan.  (R. 370-72).

II.    DEFINITION OF "DISABILITY" AND BURDEN OF PROOF

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

12

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423 (d)(2),(3).

Under the regulations as promulgated by the Commissioner, a five-step sequential analysis must be followed when evaluating a disability claim.  20 C.F.R. § 404.1520(a).  That analysis is as follows:

1.  The ALJ first determines whether the applicant is currently working; if so, the claim is denied.

2.  The ALJ determines solely on the basis of the medical evidence whether the claimed impairment is severe, "that is, a magnitude sufficient to limit significantly the individual's physical or mental ability to do the basic work activity"; if not, the claim is denied.

3.  The ALJ decides, again, only using medical evidence, whether the impairment equals or exceeds in severity certain impairments described in the Commissioner's Listing of Impairments; if it does, the claimant is automatically

13

entitled to disability benefits.

4.     The ALJ considers whether the applicant has sufficient "residual functional capacity," defined as what an individual "can still do despite her limitations," to perform the claimant's past work; if so, the claim is denied.

5.     The ALJ decides, on the basis of the claimant's age, education, work experience, and residual functional capacity, whether the claimant can perform any other gainful and substantial work within the economy. It is only during the final stage of the decision-making process that the ALJ is authorized to use the "Grids," that is, the Medical-Vocational Guidelines set out in Appendix 2 to Subpart P of Part 404 of the Commissioner's regulations.

20 C.F.R. § 404.1520.

The burden of proof in a disability case is divided between the claimant and the Commissioner. The claimant bears the initial burden of establishing the existence of a disabling condition by demonstrating that he is unable to perform his former type of work. Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983). Once the claimant has met this burden, the burden of production shifts to the Commissioner to show that, considering the claimant's age, education, work experience, and impairment, other jobs exist in the national economy that the claimant can perform. See Boyd, 704 F.2d at 1209. The overall burden of persuasion, however, remains with the claimant to prove that she is unable to perform any of the jobs suggested by the Commissioner. See id.

14

III.   <u>FINDINGS OF THE ALJ</u>

In this case, the ALJ found that Plaintiff has the following "severe" impairments: diabetes and gastroparesis.  (R. 21).  He also found that these impairments do not meet or equal an impairment in the Commissioner's Listing of Impairments, and that Plaintiff's allegations regarding her limitations are not "totally credible."  (<u>Id</u>.).[3]  The ALJ then concluded that Plaintiff has the residual functional capacity ("RFC") "to lift and carry at least 10 pounds occasionally and to be able to stand and or walk for two hours out of an eight hour day and to sit for six hours out of an eight hour day."  (<u>Id</u>.).  Finally, the ALJ concluded that this RFC would not preclude Plaintiff from performing her past relevant work as a collections clerk.  (<u>Id</u>.).

IV.   <u>STANDARD OF REVIEW</u>

In reviewing the Commissioner's decision, this Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).  The Court's only role is to determine whether the Commissioner applied the proper legal standards and whether

---

[3]The reasons given for the ALJ's credibility finding are discussed in greater detail below.

15

substantial evidence exists in the record to support the Commissioner's findings. Walden v. Schweiker, 672 F.2d 835 (11th Cir. 1982); 42 U.S.C. § 405(g). "Substantial evidence" means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It may be present even if a preponderance of the evidence weighs in favor of the claimant. Barnes, 932 F.2d at 1358.

This lenient standard of review does not "relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether the substantial evidence supports each essential administrative finding." Walden, 672 F.2d at 838. Indeed, "[i]t is incumbent upon the reviewing court to examine the findings and decisions of the [Commissioner] in light of the record in its entirety, not only that evidence which supports the decision." Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988).

In contrast to the Commissioner's findings of fact, no presumption of validity attaches to the Commissioner's application of the law. Lamb, 847 F.2d at 701. "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983). Thus, the Commissioner must "apply the correct law"

16

and, importantly, must also "provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted . . . ." Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing Cornelius v. Sullivan, 936 F.2d 1143, 1146 (11th Cir. 1991)). See also Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)(ALJ must "state specifically the weight accorded to each item of evidence and why he reached that decision. In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence."); Owens v. Heckler, 748 F.2d 1511, 1514 (11th Cir. 1984) (Commissioner must engage in "reasoned decision making"); Ryan v. Heckler, 762 F.2d 939, 941-42 (11th Cir. 1985)(ALJ must "state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered").

V.    DISCUSSION

Plaintiff presents three arguments on appeal: (1) whether the ALJ erred by failing to utilize a medical advisor; (2) whether the ALJ erred by failing to give proper weight to the opinions of Plaintiff's treating physicians; and (3) whether the ALJ properly evaluated Plaintiff's credibility. Because the Court finds that this case must

17

be remanded for payment of benefits, Plaintiff's first argument will not be discussed.

A.    Opinions of Plaintiff's Treating Physicians

Under the Commissioner's rules and regulations, the medical opinion of a treating physician "*must* be given controlling weight, *i.e.*, it must be adopted" if it is "well-supported and not inconsistent with the other substantial evidence in the case record." Social Security Ruling ("SSR") 96-2P, 1996 WL 374188 (July 2, 1996), *1; accord 20 C.F.R. § 404.1527(d)(2)("If we find that a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). The Court of Appeals for the Eleventh Circuit has also repeatedly stated that the opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004)(citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)); see also Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987); Sharfarz v. Bowen, 825 F.2d 278, 279-80 (11th Cir. 1987); Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987); McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); MacGregor v. Bowen,

786 F.2d 1050, 1053 (11th Cir. 1986).

The opinions of treating physicians are particularly valuable where the treatment period has extended over a considerable period of time.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985).  Treating physicians are "'likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'"  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)(quoting 20 C.F.R. § 404.1527(d)(2)).

Good cause for rejecting a medical opinion exists when "(1) [the] treating physician's opinion [is] not bolstered by the evidence; (2) the evidence support[s] a contrary finding; or (3) [the] treating physician's opinion [is] conclusory or inconsistent with the doctor's own medical records."  Phillips, 357 F.3d at 1240; see also Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985).  To ensure that proper weight is accorded to the opinion of a treating physician, the Commissioner must provide "explicit and adequate" reasons for rejecting that opinion.  Elam v. Railroad Retirement Board, 921

19

F.2d 1210, 1215 (11th Cir. 1991);[4] see also Phillips, 357 F.3d at 1240 (requiring the ALJ to "clearly articulate its reasons" "[w]hen electing to disregard the opinion of a treating physician"); MacGregor, 786 F.2d at 1053. "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." MacGregor, 786 F.2d at 1053.

### 1.    Drs. Gibson and Waring

The ALJ gave "little weight" to the opinions of Drs. Gibson and Waring. (R. 19). With respect to Dr. Gibson, he stated:

> The claimant saw the doctor on January 21, 2003, but the most recent time prior to this date was on November 5, 1999. The statement therefore is not based on a continuous period of treatment. In view of this absence of contact with the claimant, Dr. Gibson should be treated as a consulting physician more so than a treating physician.

(R. 19). The ALJ was also "impressed that [Dr. Gibson's] opinions may be based more on Claimant's reports [rather] than actual medical evaluation." (Id.).

With respect to Dr. Waring, the ALJ noted that the record is limited to treatment

---

[4]The Eleventh Circuit noted in Elam that the "provisions of the Railroad Retirement Act are so closely analogous to those of the Social Security Act that regulations interpreting the latter are applicable to the former." Elam, 921 F.2d at 1213.

notes from 1999 and 2000 and that, in January 2000, Dr. Waring stated that Plaintiff was doing splendidly.  (R. 19; see also R. 297).  This statement, the ALJ concluded, "is not in keeping" with the opinions given by Dr. Waring in September 2004.  (Id.).  The ALJ was also "impressed that [Dr. Waring's] September 29, 2004 statement is more a reflection of . . . things reported by the claimant to Dr. Waring [rather] than facts uncovered by Dr. Waring through tests and treatment of the claimant since there are no treatment records from 2003 and 2004 . . .."  (Id. at ).

Although neither doctor had seen Plaintiff for some time prior to issuing their opinions regarding her functional capacity, Dr. Gibson had examined her contemporaneously therewith and had received reports regarding her condition from other healthcare providers.  (See, e.g., R. 305).  Moreover, even if the ALJ could have reasonably concluded that neither opinion is well supported (due to the length of time between examinations) and therefore not controlling, this does not mean that the opinions may be summarily discarded.

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported . . . means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's

> medical opinion will be entitled to the greatest weight and
> should be adopted, even if it does not meet the test for
> controlling weight.

SSR 96-2P, *4.  The factors listed in § 404.1527, which are applicable in this case,

apply to "any medical opinion" and include: (1) length of the treatment relationship

and the frequency of examinations, (2) nature and extent of the treatment relationship

(*i.e.*, how involved the doctor was in the patient's treatment and how much information

he gathered through examinations and testing), (3) how well the opinion is supported

with medical evidence, (4) how consistent the opinion is with the record as a whole,

and (5) whether the doctor has a relevant specialization.  20 C.F.R. § 404.1527(d).

Plainly, as the ALJ recognized, Plaintiff's treatment relationships with Drs.

Gibson and Waring were not consistent, which reduces the weight of their opinions.

Nonetheless, both doctors saw Plaintiff frequently for limited periods of time and were

actively involved in her treatment. The medical specialty of both doctors –

gastroenterology – also adds weight to their opinions.  More significantly, as will be

discussed further below, the opinions of Drs. Gibson and Waring gain additional

credence because they are consistent with Dr. Amu's opinion and the record as a

whole, including Dr. Gibson's subsequent treatment notes.

The ALJ also relies, in part, on his impression that their opinions are overly

22

dependent on Plaintiff's reports of her symptoms, rather than "actual medical evidence."  (R. 19).  A patient's report of complaints, however, "is an essential diagnostic tool." Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997)(citing Brand v. Secretary of the Dep't of Health, Educ. and Welfare, 623 F.2d 523, 526 (8th Cir. 1980)("[a]ny medical diagnosis must necessarily rely upon the patient's history and subjective complaints").  As in Flanery, "[t]here is nothing in this record to suggest that [Plaintiff's] medical professionals should have doubted [her] word.  Her claimed symptoms are consistent with objective tests [showing delayed gastric emptying], the nature of her disorder, and [her] testimony." Flanery, 112 F.3d at 350.

Finally, the ALJ points to Dr. Waring's statement in January 2000 that Plaintiff was doing "splendidly."  (R. 19, 297).  This statement represents only a single point in time, however.  Subsequent medical evidence demonstrates that Plaintiff's condition deteriorated quickly after the January visit.  In May 2000, for example, Plaintiff visited a hospital emergency room, where she was found to be suffering from "nausea, vomiting, edema and hypertension," plus "generalized weakness."  (R. 144).

### 2.    Dr. Amu

With respect to Dr. Amu, the ALJ noted that he was Plaintiff's primary care

physician and that, for this reason, he was "presumably treating the claimant for diabetes." (R. 19). He then stated:

> From his records, it does not appear that her diabetes is out of control. The statement does not persuade the undersigned to conclude that the claimant cannot perform any work. Instead, it reinforces the undersigned's findings that the claimant can sit and walk for periods of time that would allow her to perform work at least at the sedentary level.

(Id.).

The ALJ has misconstrued Dr. Amu's relationship with Plaintiff. Dr. Amu was not treating Plaintiff solely for diabetes; he was also involved with Plaintiff's treatment for gastroparesis and indeed was the only doctor providing treatment for this condition from September 2001 through the end of 2002. Furthermore, Dr. Amu received reports regarding Plaintiff from her gastroenterologists. (See, e.g., R. 189, 318). Indeed, Dr. Amu may have been in the best position of all of Plaintiff's doctors to provide an opinion regarding her overall health and limitations given his status as her primary care physician and his lengthy relationship with her. Finally, as Plaintiff argues, whether her diabetes was under control is not the primary issue in this case. Plaintiff claims that her diabetic gastroparesis is disabling, not simply her diabetes.

24

3.   Consistency of the record

Notably, with the exception of the opinion of a non-examining consultant, the record as whole (including Plaintiff's testimony) consistently supports a finding that Plaintiff's gastroparesis resulted in severe symptoms, which would preclude gainful employment.  Even if each individual opinion or piece of evidence could be construed as deficient in some manner, the consistency of the opinions and the record as a whole adds to their individual and cumulative weight.

Moreover, the   ALJ "may not arbitrarily reject uncontroverted medical testimony." Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982)(citing Goodley v. Harris, 608 F.2d 234 (5th Cir. 1979)); cf. Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985)(reversing ALJ's finding that the claimant's impairment was not severe where the record contained "uncontroverted medical testimony from two examining physicians" finding the claimant "totally disabled to return to her specific former work activities").  Stated differently, the ALJ may not make findings in conflict with a medical opinion simply by finding fault with that opinion; he must have *medical* evidence in support of his contrary finding.  See Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987)(finding that a treating doctor's opinion could not be rejected where no other medical evidence *conclusively* countered that opinion and no other good cause

25

was shown).  To allow otherwise would permit the ALJ to substitute his uninformed opinion for the opinion of a medical professional, which has long been prohibited.  See Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982); Graham v. Bowen, 786 F.2d 1113, 1115 (11th Cir. 1986); Marbury v. Sullivan, 957 F.2d 837, 840-41 (11th Cir. 1992)(Johnson, J., concurring)(finding that an "ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians").[5]

Under the Commissioner's guidelines, to be considered "not inconsistent" with the record as a whole, a treating physician's medical opinion "need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion."  SSR 96-2P, 1996 WL 374188, *3.  To the extent the ALJ intended to rely on the contrary opinion of the non-examining consultant, "[t]he opinions of nonexamining, reviewing physicians, . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone

---

[5]An ALJ may find that the medical evidence, even if consistent, is insufficient to make a determination regarding disability.  If this is the case,  he is required to seek additional medical evidence before making a decision.   See 20 C.F.R. § 404.1527(c)(3).  Here, the ALJ made no such finding.

do not constitute substantial evidence." <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 280 (11th Cir. 1987). Accordingly, reliance on the consultant's opinion would not have been appropriate in this case.

For these reasons, the Court finds that the reasons offered by the ALJ for rejecting the opinions of Plaintiff's treating physicians are not supported by substantial evidence.

**B.**     <u>Plaintiff's credibility and application of the "pain standard"</u>

Plaintiff also argues that the ALJ improperly evaluated her credibility with respect to her subjective symptoms. (Doc. 11 at 19-25). Complaints of subjective symptoms[6] (including pain, fatigue, malaise, weakness, and shortness of breath, among others), if believed, may give rise to a disability finding if the record contains "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the alleged

---

[6]Vomiting is, of course, not a subjective symptom (although nausea is). Nonetheless, the ALJ seems to have included Plaintiff's reports of vomiting in this category because he gives no separate reasons for discrediting her statements regarding the frequency of her vomiting.

27

pain [or other symptoms]." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)); see also 20 C.F.R. § 404.1529(b). Under this "pain standard," the ALJ may not reject a claimant's "statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2); accord Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

Whether Plaintiff had a medical condition that could reasonably be expected to give rise to the alleged symptoms is a question of fact subject to the substantial evidence standard of review. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988); Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1985). At this point in the evaluation process, only "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques," may be considered. 20 C.F.R. § 404.1529(b). If the ALJ finds that a medically established condition is capable of producing the alleged symptoms, only then must he determine the actual intensity, persistence, and functionally limiting effects of the symptoms on the particular claimant. Id.; Social Security Ruling ("SSR") 96-7P, 1996 WL 374186, *1-*2; accord

28

20 C.F.R. § 404.1529(b).

The ALJ acknowledged that Plaintiff had "experienced, at various times [in 1999 and 2000,] to a greater or lesser extent, functional limitations as a result of vomiting, nausea, and chronic symptoms arising from gastroparesis," but concluded that her condition was "not as severe as alleged and would not have prevented her from performing work for a consecutive period of twelve months." (R. 20). In support of this credibility determination, the ALJ stated:

> [T]he objective medical evidence does not confirm the alleged symptoms arising from an underlying medical condition, or the presence of an objectively determined medical condition, that reasonably could be expected to give rise to the alleged limitations of such severity so as to render the claimant continuously disabled for a continuous period of twelve months or more. Although the evidence shows that the claimant had medically determinable impairments that could have produced the alleged symptoms, the evidence does not support the claimant's allegations of the intensity and persistence of such symptoms.

(R. 20).[7]

---

[7]Elsewhere, the ALJ stated that "[t]here was no objective medical basis to substantiate the alleged duration, intensity and frequency of pain and other symptoms . . . so as to render the claimant continuously disabled for a period of twelve months or more that would not have been remediable by prescribed treatment." (R. 23). To the extent the ALJ believed that *constant* inability to function is a requisite for a finding of disability, he is incorrect. See Gatliff v. Commissioner of SSA, 172 F.3d 690, 693-94 (9th Cir. 1999)(discussing cases finding that substantial gainful activity

The ALJ's statement does not clearly demonstrate how he applied the pain standard. He plainly concluded that Plaintiff suffers from a medical condition (gastroparesis) and that the *objective medical evidence* does not *confirm* the severity of Plaintiff's subjective complaints. Whether he properly applied the third step in the analysis – determination of whether Plaintiff's "objectively determined medical condition can reasonably be expected to give rise to the alleged pain," Wilson, 284 F.3d at 1225 – is less obvious. The ALJ may have merged the third step in the pain standard with his evaluation of the intensity, persistence, and limiting effects of Plaintiff's symptoms. He states both that "the objective medical evidence does not confirm . . . the presence of an objectively determined medical condition, that reasonably could be expected to give rise to the alleged limitations of such severity," and that "the evidence does not support the claimant's allegations of the intensity and

_____

requires the ability to hold a job for a significant period of time); Kangas v. Bowen, 823 F.2d 775, 777-78 (3rd Cir. 1987)(remanding based on ALJ's failure to consider whether a claimant, who required frequent hospitalizations, could perform sustained work); Smith v. Schweiker, 646 F.2d 1075, 1081 (5th Cir. Jun. 1981)(finding that a condition that prevents work for a full day, due to the need for rest periods, constitutes a disability); Smith v. Califano, 637 F.2d 968, 971-72 (3rd Cir. 1981)("sporadic or transitory activity does not disprove disability"); Markham v. Califano, 601 F.2d 533 (10th Cir. 1979)("Substantial gainful activity means performance of substantial services with reasonable regularity"); 20 C.F.R. § 404.1545(b)(describing RFC as "your residual functional capacity for work on a *regular and continuing basis*") (emphasis added).

AO 72A
(Rev.8/82)

persistence" of her symptoms even though her condition "could have produce the alleged symptoms." (R. 20).

Given the nature of diabetic gastroparesis described in the medical sources cited above, Plaintiff's objectively documented gastroparesis was at least *theoretically* capable of causing the symptoms she alleges, whether or not it actually did so. Cf. Sewell v. Bowen, 792 F.2d 1065, 1068 (11th Cir. 1986)(relying on medical texts to find that bursitis could cause disabling pain); Swindle v. Sullivan, 914 F.2d 222, 225 (11th Cir. 1990)(relying on the Attorney's Textbook of Medicine). To the extent the ALJ found to the contrary, his finding is not supported by substantial evidence.

Alternatively, the ALJ may have found that Plaintiff's statements regarding her subjective symptoms are not credible in light of the record as a whole (even if diabetic gastroparesis theoretically could have produced the alleged symptoms). Such a finding would require consideration of *all* of the evidence, both medical and testimonial. SSR 96-7P, 1996 WL 374186, *1-*2; 20 C.F.R. § 404.1529(c)(1); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995). Relevant factors the ALJ must consider include, but are not limited to, evidence regarding the claimant's daily activities; the location, duration, frequency and intensity of her symptoms; the type, dosage, effectiveness, and side effects of her medications; other treatment received for relief of the symptoms; and any

measures used by the claimant to alleviate the symptoms.  20 C.F.R. § 404.1529(c)(3).

Consideration must also be given to "whether there are any inconsistencies in the

evidence and the extent to which there are any conflicts between [the claimant's]

statements and the rest of the evidence . . . ."  20 C.F.R. § 404.1529(c)(4).

As reasons for rejecting Plaintiff's credibility with respect to the intensity and

persistence of her symptoms, the ALJ stated:

> The claimant's representative argues that the claimant was
> taking her medication as prescribed but thought nothing
> could be done for her situation [sic] thus did not seek
> treatment. This is an explanation for the absence of medical
> treatment.  The undersigned rejects this argument.  The
> claimant was seeing doctors primarily for treatment of the
> severe symptoms of her medical condition, namely nausea,
> vomiting, and weight gain [sic].  In early 2000, these
> symptoms began to become less frequent and she began to
> gain weight, thus she did not need to be treated for
> dehydration and other problems associated with nausea and
> vomiting. Moreover, one would reasonably expect a person
> to be seeking medical treatment for symptoms as alleged
> and there are none. Thus the undersigned concludes that the
> claimant's condition[] was not as severe as alleged and
> would not have prevented her from performing work for a
> consecutive period of twelve months.

(R. 20).  This explanation suffers from several flaws, not the least of which is its lack

of coherence.  To conclude that Plaintiff's symptoms have abated, the ALJ relies, in

part, on his statement that Plaintiff's "symptoms began to become less frequent" in

AO 72A
(Rev.8/82)

early 2000, thus creating a circular argument. The ALJ also states, in a sentence that suffers from lack of clarity, that "one would reasonably expect a person to be seeking medical treatment for symptoms as alleged and there are none." (R. 20). Apparently, the ALJ intended to state, or imply, that Plaintiff's lack of doctor visits for a period of time demonstrates that her symptoms had abated, because individuals normally seek treatment for severe symptoms.

The ALJ's findings regarding Plaintiff's credibility are subject to the substantial evidence standard of review. Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote, 67 F.3d at 1562 (citing MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986)); see also Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).

The Court finds that the ALJ has not provided a "clearly articulated credibility finding," and moreover, has provided inadequate reasons for rejecting Plaintiff's subjective complaints. Plaintiff's complaints are consistent with the medical record as a whole and are well supported by the opinions of her treating physicians.

With respect to gaps in Plaintiff's medical treatment, the Commissioner's guideline for assessing credibility recognizes that, although a claimant's complaints

33

may be less credible if the claimant has not sought regular medical treatment, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Social Security Ruling ("SSR") 96-7P, 1996 WL 374186, *7 (July 2, 1996). This is required because failure to seek medical treatment may be the result of factors that do not detract from credibility, such as inability to pay for treatment, or as apparently occurred in Plaintiff's case, receipt of advice "by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual." Id., *8. At the hearing, Plaintiff provided a logical explanation for gaps in her medical treatment, which was not discussed in the ALJ's analysis. Moreover, she in fact continued to receive treatment through prescription medication during this time period.

For these reasons, the Court finds that the ALJ has not provided adequate reasons for dismissing Plaintiff's subjective complaints.

C.     Remand for benefits warranted

Finally, Plaintiff contends that this case should be remanded to the Commissioner for payment of benefits, rather than simply for additional proceedings. The role of this Court in Social Security cases is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings; it is not to find facts.  Because of this limited role, when errors occur, the general rule is to reverse and remand to the Commissioner for additional proceedings. See, e.g., Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993)(referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223-24 (11th Cir. 1991).  "This court, however, may . . . remand the case for an . . . award[ of] disability benefits where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." Davis, 985 F.2d 528, 534 (11th Cir. 1993); see also Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984); Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991).  Put differently, remand for payment of benefits is warranted where "there [is] not substantial evidence on the record as a whole to support the [Commissioner's] denial of benefits." Bowen, 748 F.2d at 636.

The Court finds that this is one of the unusual cases warranting remand for an

35

award of benefits.  Given the absence of evidence that can properly be construed as inconsistent with the opinions of Plaintiff's treating physicians, as well as the fact that those opinions are supported by medical evidence and Plaintiff's testimony, the record simply is not capable of supporting a contrary finding.


V.    CONCLUSION

For the reason stated, the Commissioner's final decision denying Plaintiff's application for supplemental security income is **REVERSED** and this action is **REMANDED** to the Commissioner for payment of benefits.

Plaintiff's attorney is authorized to seek this Court's approval of attorney's fees under the Social Security Act provided the motion is filed within 30 days after counsel is served with notice of the amount of past-due benefits.

IT IS SO ORDERED, this 17th day of August, 2007.


_Gerrilyn G. Brill_

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

T:\FINAL.SS\SlatonSharon.wpd

36